Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/27/2025 09:09 AM CDT

J.R.M.B., a minor child, by and through his mother
Dawn M. Morgan-Baker, as natural guardian and
next friend, appellant, v. Alegent Creighton
Health Creighton University Medical
Center, LLC, et al., appellees.

___ N.W.3d ___

Filed June 27, 2025.    No. S-24-205.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
2. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.
3. **Jury Instructions: Appeal and Error.** Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.
4. **Appeal and Error: Words and Phrases.** Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Reversed and remanded for a new trial.

Joseph P. Cullan, Patrick J. Cullan, and Joseph S. Fox, of Cullan & Cullan, L.L.C., for appellants.

Michael L. Storey, Cathy S. Trent-Vilim, and Patrick G. Vipond, of Lamson, Dugan & Murray, L.L.P., for appellees.

Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Freudenberg, J.

## I. INTRODUCTION

A son, by and through his mother, brought a claim for medical malpractice/negligence against an obstetrician, the clinic where the obstetrician was employed, and the hospital involved in the son's birth, which resulted in his obstetric brachial plexus injury. At trial, the district court excluded the package insert for Pitocin, which was used during the birth, ruling that the information it contained was hearsay and did not fall under the learned treatise exception and that it lacked foundation. The son also argues that the court erred by not giving his requested jury instructions and giving other allegedly erroneous instructions, which he did not object to at trial. Because an instruction given on the central issue of the standard of care was erroneous, we reverse, and remand for a new trial.

## II. BACKGROUND

In 2013, Dawn M. Morgan-Baker was admitted to the labor and delivery unit of a hospital operated by Alegent Creighton Health Creighton University Medical Center, LLC, in Omaha, Nebraska, for her anticipated delivery of her son, J.R.M.B. (J.R.). She was at 36 weeks gestation. She had suffered a fall the day before, causing a "spontaneous rupture of membranes" before her admission. The rupture of membranes increased the risk of infection if J.R. was not delivered within a reasonable period of time. At the hospital, Morgan-Baker attempted to deliver J.R. without the assistance of Pitocin, but she did not go into labor. Pitocin is a solution of synthetic oxytocin that can be used to cause uterine contractions or to strengthen them during labor.

Peggy H. Jones, M.D., F.A.C.O.G., an obstetrician and gynecologist employed by Alegent Creighton Clinic and affiliated with the hospital, ordered the hospital's nursing staff to administer Pitocin. Jones also instructed the nursing staff to increase Morgan-Baker's dose of Pitocin every 30 minutes, depending on their assessment of her contraction pattern. Staff employed continuous fetal monitoring and an intrauterine pressure catheter to measure contractions.

Morgan-Baker's contractions became more frequent as the dose of Pitocin increased. Due to the staff's observations of Morgan-Baker's having more than 5 contractions within a 10-minute period averaged over 30 minutes, considered "tachysystole," along with Morgan-Baker's complaints of pain and a spike in Morgan-Baker's blood pressure, Jones directed the staff to decrease the dose of Pitocin by half and to stop the Pitocin if decreasing the dose did not eliminate the tachysystole. Staff decreased the Pitocin. Later, Jones ordered that staff increase the dose of Pitocin in accordance with protocol and alert her to any concerns. The nursing staff increased the dose of Pitocin.

When Morgan-Baker progressed enough in her labor, she began pushing and delivered J.R.'s head, but his body did not follow. Jones recognized that J.R.'s right anterior shoulder was impacted behind Morgan-Baker's pubic bone, a situation referred to as "shoulder dystocia." At no point during the labor was J.R.'s heart rate abnormal, and there was no indication that he was not getting enough oxygen. However, if not resolved quickly enough, shoulder dystocia can cause hypoxia, because the umbilical cord becomes pinched against the pelvis.

Jones and the nursing staff implemented the "McRoberts maneuver" to resolve the shoulder dystocia. The maneuver opens the pelvic outlet by pulling a mother's legs up toward her chest. The McRoberts maneuver was successful, and Jones delivered J.R.

J.R. was later diagnosed with a permanent brachial plexus injury due to damaged nerves in his left posterior shoulder

and neck, limiting the use of his left arm. J.R., by and through Morgan-Baker, brought this lawsuit against the hospital, the clinic, and Jones (collectively Alegent).

J.R. alleged that Jones and, vicariously, the clinic were negligent because Jones used more than gentle traction when delivering him and failed to communicate to the nursing staff the appropriate administration of Pitocin. J.R. alleged that the hospital was negligent because its nursing staff failed to communicate to Jones the signs of tachysystole, administer Pitocin appropriately, and interpret the intrauterine pressure catheter.

## 1. Opening and Closing Statements

In J.R.'s opening and closing statements, his counsel asserted that J.R.'s shoulder dystocia was caused by a "Pitocin over-dose," which created a "hyperstimulation of the uterus" and resulted in excessive endogenous forces of labor, primarily tachysystole.

In Alegent's opening and closing statements, counsel said that J.R.'s injury occurred in utero when J.R.'s left shoulder became caught on the sacral promontory, which occurred before Jones identified the right shoulder dystocia and applied the McRoberts maneuver to deliver J.R., and that no one was at fault for J.R.'s injury. Counsel stated that tachysystole is "not a scary word" and that "[a]ll it means is that there are more than five contractions in a ten-minute period averaged over a 30-minute period." It "can be a danger to the baby" but is "not necessarily," and counsel asserted that neither tachysystole nor the Pitocin contributed to the right shoulder dystocia. Counsel asserted that Jones did not use excessive force in delivering J.R. or otherwise breach the standard of care.

## 2. J.R.'s Expert Witnesses

During J.R.'s case in chief, J.R. called as medical experts Dr. Fred Duboe and Dr. Martin Gubernick. Both specialize in obstetrics and gynecology.

## (a) Duboe's Testimony

Duboe opined that the initial order to start Morgan-Baker on Pitocin was appropriate. However, based on her uterus' response to the medication, Morgan-Baker experienced a relative "Pitocin overdose." Specifically, Duboe opined the nursing staff failed to decrease the dose of or stop the Pitocin when signs of tachysystole were noted.

At one point, Duboe equated a "Pit[o]cin overdose" with what "we call uterine tachysystole." He later defined tachysystole as occurring when one of four conditions occur: (1) greater than five contractions in a 10-minute period averaged out over 30 minutes time, (2) a uterine resting tone of greater than 25 millimeters (hypertonus), (3) less than 60 seconds of rest between contractions, and (4) the inability for the uterus to relax between contractions (tetanic uterine tachysystole).

In his review of the medical records, Duboe opined that after the nursing staff restarted the Pitocin and continued to increase the dose, Morgan-Baker had a resting tone of 25 millimeters, greater than five contractions in a 10-minute period averaged out over 30 minutes time, tetanic contractions, and less than 60 seconds of rest between some of her contractions. Duboe testified that the applicable policies and guidelines for the administration of Pitocin when there is persistent tachysystole advise decreasing the dose of Pitocin by one-half and reassessing every 10 minutes to see if the tachysystole persists and decreasing the dose of and eventually stopping Pitocin, if necessary, to eliminate the tachysystole. He testified that if decreasing the dose of Pitocin does not eliminate the tachysystole, then "you turn [it] off . . . [t]hat's the hospital policy, and that's the standard of care."

Duboe opined that the "overaggressive[]" use of Pitocin, considering Morgan-Baker's tachysystole, was "one of the factors that contributed to the shoulder dystocia" by interfering with the "regular uterine contractions bringing [J.R.] down [the] birth canal." Citing to medical authorities, Duboe

testified that "Pit[ocin] is a known and undisputed risk factor for shoulder dystocia."

Duboe opined that Jones, in addressing the shoulder dystocia, then applied "[e]xcessive traction, upward bending of the neck, in this case, the posterior arm," which was the proximate cause of the brachial plexus injury—specifically, "a permanent injury regarding C5 and C6 nerve roots caused by excessive traction and bending of the neck away from the contralateral shoulder." Duboe testified that while such excessive traction can sometimes be warranted when there are immediate concerns of brain damage due to oxygen deprivation after 6 minutes of trying to maneuver a baby out, that was not the case for J.R.

### (b) Gubernick's Testimony

Gubernick similarly testified to a reasonable degree of medical certainty that Jones violated the applicable standard of care by exerting lateral traction, which caused a permanent brachial plexus injury to C5, C6, and C7 of the brachial plexus. He also similarly opined, by citing to medical authorities, that the dosage of the Pitocin administered by the nursing staff was inappropriate and directly related to the shoulder dystocia by causing "dysfunctional labor." He opined it was speculative that J.R. had suffered a left shoulder dystocia on the sacral prominence and further opined that the forces of labor have never been shown to cause a permanent brachial plexus injury.

### (c) Jones' Testimony

Jones was called to testify by both J.R. and Alegent. She explained that she lowered the dosage of Pitocin because Morgan-Baker had reported a spike in the pain of her contractions and her blood pressure had gone up. Jones later directed that the Pitocin be restarted because the strength of Morgan-Baker's contractions was not adequate for cervical change.

Jones explained that she recognized during delivery there was shoulder dystocia but that it resolved "very easily." Once

J.R.'s shoulder was dislodged and delivered, she used gentle upward traction to guide J.R. "up and out," just as she would in the delivery of any baby. Jones testified that she did not use excessive lateral traction, as "[t]here was no need." Moreover, she testified the guidelines for acceptable traction generally apply to the anterior shoulder, because that is the part of the shoulder that gets stuck, whereas there is only soft tissue underneath the anterior shoulder—"there's nothing bony or anything fixed to hold that posterior shoulder back." She testified that the fact J.R.'s anterior shoulder was injured "makes things very unique here." According to Jones, "50 percent of brachial plexus injuries occur with normal spontaneous vaginal deliveries where there's no shoulder dystocia."

Jones opined that she and the nursing staff met the applicable standard of care. Jones acknowledged that Pitocin can be a contributor to tachysystole, but she did not recognize the term "tetanic contraction" as something recognized in clinical practice. She also stated that whether contractions are "too long" depends on a number of circumstances. Jones testified that she looked at the monitoring data for Morgan-Baker and could identify only two times there were 15½ contractions within the requisite period and one time, toward the end, when there were 16 contractions. She testified that this was not medically concerning by itself and that no other monitoring data made her concerned.

Jones did not identify from Morgan-Baker's medical records that she had any contractions that lasted longer than 2 minutes. Jones also noted that the hospital's "Pitocin protocol does not even address hypertonus." Jones opined that there was no indication in Morgan-Baker's case that too much Pitocin had been administered. Jones testified that everything about J.R.'s vitals "looked very appropriate."

### 3. Alegent's Expert Witnesses

In addition to Jones, Alegent called as expert witnesses Dr. William Kuyper, a specialist in obstetrics and gynecology,

and Dr. Andrew Robertson, a specialist in maternal fetal medicine, as well as Michele Grimm, who has a doctorate degree in biomedical engineering.

### (a) Kuyper's Testimony

Kuyper testified that Jones met the applicable standard of care in delivering J.R. Kuyper opined that a permanent brachial plexus injury can occur without the use of excessive lateral traction. Based on his review of the evidence, Jones did not apply excessive traction or violate the standard of care. He also noted it is extremely unusual for there to be a posterior brachial plexus injury, which is what occurred to J.R. Typically, a brachial plexus injury occurs on the anterior shoulder, which, in this case, was J.R.'s right shoulder, and results from an anterior shoulder dystocia.

Kuyper also opined that Jones' "order set" complied with the standard of care for administering Pitocin and that the nursing staff met the standard of care in relation to the dosage of Pitocin and communication with Jones. He found no signs of a "Pitocin overdose," which, in any event, was not a defined term used by obstetricians.

Kuyper defined tachysystole as more than five contractions in a 10-minute period over a 30-minute period. Referring to the order set that had been entered into evidence as an exhibit, he noted that the order set likewise defined tachysystole as greater than five contractions in a 10-minute period averaged over a 30-minute period.

On cross-examination, however, Kuyper recognized the same four indicators of tachysystole that were described by Duboe, which are set forth in both the Association of Women's Health, Obstetric and Neonatal Nurses and the American College of Obstetricians and Gynecologists.

But, on redirect, Kuyper confirmed that the nursing staff would have used the definition of tachysystole given in the order set.

Kuyper agreed that Morgan-Baker experienced tachysystole "[b]y definition of pure counting"; however, it was not clinically significant and did not occur during the entire labor. He acknowledged that guidelines state that if tachysystole persists after decreasing the infusion rate of Pitocin for 10 minutes, to discontinue the Pitocin and notify the provider, and he could not recall from reviewing the order set that the nursing staff notified Jones of persisting tachysystole. Kuyper believed Jones was monitoring the situation and "looking at a lot of different clinical information," and Kuyper pointed out that the Pitocin guidelines are "'suggested'" dosages to be considered "looking at the whole patient, how is the baby tolerating the labor as evidenced by the fetal heart tracing." Ultimately, Kuyper opined that neither Jones nor the nursing staff were the cause of J.R.'s brachial plexus injury.

### (b) Grimm's Testimony

Grimm testified she has been involved in developing advanced computational models of brachial plexus injuries during childbirth to understand the mechanisms of the injury and reduce its occurrence. Grimm testified that maternal forces caused greater pressure at the shoulder than clinician-applied forces, such as traction. Grimm opined that maternal forces can cause permanent injury when there is shoulder dystocia. Grimm also discussed how a brachial plexus injury could occur in utero and testified that she thought that J.R.'s brachial plexus injury occurred during a contraction during labor.

### (c) Robertson's Testimony

Robertson opined that Jones met the standard of care in delivering J.R. and that the nurses met the applicable standard of care in their administration of Pitocin. Robertson testified that the principal risks of Pitocin are hypoxia in the baby, uterine rupture, and water intoxication of the mother. None of those occurred in this case. Robertson opined that Pitocin does not increase the risk of shoulder dystocia, except to the extent it increases the chances of having a vaginal delivery. Pitocin

in this case had "nothing to do . . . with how [J.R.] was going to come down. [He] was going to come down and get caught one way or the other, if she was going to deliver vaginally."

Robertson testified that "[e]xpulsive forces can cause brachial plexus injuries" and that maternal forces are part of such expulsive forces. He explained, "You don't separate the contractions from maternal pushes." On cross-examination, Robertson generally denied that a mother's pushing "was something she did wrong" and instead stated that it was "just the natural process of vaginal delivery." It was Robertson's belief that J.R.'s left posterior shoulder became stuck before the right anterior shoulder did and that the left shoulder continued to be stuck while J.R. was experiencing the right shoulder dystocia that was identified by Jones. He opined: "[I]t probably took getting this anterior shoulder out to relieve the pressure on the posterior shoulder." Robertson noted there was no manipulation of the posterior arm by Jones.

Robertson opined on cross-examination that hypertonus is not a form of tachysystole, though he acknowledged there are different definitions. Robertson explained that hypertonus can present a risk of decreasing oxygen to the baby but it is "not a lot of work on the uterus" and that thus, "[t]hey're two separate issues." Robertson noted only a "couple periods of time when there might have been more than 15 contractions" in the requisite period of time to constitute tachysystole, which did not warrant reducing the dosage of Pitocin.

## 4. Exhibits

Numerous exhibits were offered by both parties and accepted into evidence. Among the exhibits were Morgan-Baker's medical records, which included the order set and her fetal monitoring strips. The exhibits also included the hospital's policy on administering Pitocin and assessing a pregnant or laboring patient who has been administered Pitocin. The policy defines tachysystole as greater than five contractions in a 10-minute period, averaged over a 30-minute period.

### 5. Jury Instructions and Verdict

The jury was instructed on J.R.'s claims that Jones was professionally negligent by using more than gentle lateral traction and/or failing to communicate regarding the administration of Pitocin in an appropriate manner and that Alegent was negligent by failing to (1) communicate to Jones the signs of tachysystole, (2) administer Pitocin in an appropriate manner, and/or (3) properly interpret the intrauterine pressure catheter. The jury was instructed that before J.R. could recover against Alegent, he must prove professional negligence; that such professional negligence was a proximate cause of his injury and damages; and the extent of those damages.

In instruction No. 1, the jury was told it "must apply the law in these instructions, even if you believe that the law is or should be different." Further, "No one of these instructions contains all of the law applicable to this case. You must consider each instruction in light of all of the others."

Instruction No. 2 explained to the jury that "[t]his is a medical negligence action" and that J.R. "claims that [Alegent was] professionally negligent." J.R. claimed Jones was professionally negligent by using more than gentle lateral traction and/or failing to communicate regarding the administration of Pitocin in an appropriate manner and that the hospital was negligent by failing to "communicate to Dr. Jones signs of tachysystole," and/or "administer Pitocin in an appropriate manner," and/or "properly interpret the [i]ntrauterine [p]ressure [c]atheter." Instruction No. 2 explained that Alegent alleged Jones "possessed and exercised the degree of skill and care expected of an OB/GYN practicing her specialty in Omaha . . . or similar communities."

Instructions Nos. 5 and 10 defined for the jury the applicable standard of care. J.R. did not object to instruction No. 5 or instruction No. 10 before they were given to the jury.

Instruction No. 10 contained two parts. The parties agree it has a typographical error in the second part, wherein it states that the jury "shall *not* determine the standard of care . . .

from the testimony of the expert witnesses who testified in this case." (Emphasis supplied.)

Instruction No. 10 first sets forth, as defined by Neb. Rev. Stat. § 44-2810 (Reissue 2021), of the Nebraska Hospital-Medical Liability Act, that

> [m]alpractice or professional negligence shall mean that, in rendering professional services, a healthcare provider has failed to use the ordinary and reasonable care, skill and knowledge ordinarily possessed and used under like circumstances by members of his/her profession engaged in a similar practice in this or similar localities. In determining what constitutes reasonable and ordinary care, skill and diligence on the part of the healthcare provider in a particular community, the test shall be that which healthcare providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances.

Instruction No. 10 then described how the "standard of care," also referred to as the "required skill and knowledge," is established. It stated:

> This case involves a highly specialized field in which laymen cannot be expected to be familiar. Accordingly, the standard of care (also referred to as the required skill and knowledge to be exercised) must necessarily be established by expert witnesses. You must not, therefore, arbitrarily set your own standards, but you shall *not* determine the standard of care (also referred to as the required skill and knowledge to be exercised) from the testimony of the expert witnesses who testified in this case.

(Emphasis supplied.)

When reading instruction No. 10 to the jury, the court did not pronounce the word "not," as italicized above, but instead said, in relevant part, "You must not therefore arbitrarily set your own standards, but you *shall* determine the standard of care, also referred to as the required skill and knowledge to

be exercised, from the testimony of the expert witnesses who testified in this case." (Emphasis supplied.)

In instruction No. 5, the jury was instructed on a health care professional's "duty of care" as "the duty to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by *other physicians* engaged in a similar practice in the same or similar localities." (Emphasis supplied.) The instruction was patterned after NJI2d Civ. 12.01.

During deliberations, the jury asked the court for clarification concerning what was "to be considered when considering [the standard of care]." The jury explained that the order set only mentioned one type of tachysystole: greater than five contractions in a 10-minute period averaged over a 30-minute period. It asked if "the other 3 . . . 'text book' defin[itions]" of tachysystole were "to be considered when considering [the standard of care]," which the jury listed as "resting tone," "rest in between," and "duration of contraction."

In response, the court provided the jury with a supplemental instruction stating, "The jury may consider evidence presented in the courtroom. See Instruction No. 6." Instruction No. 6, in turn, provided what information was to be considered evidence, stating that "[t]he evidence from which [the jury was] to find *the facts*" (emphasis supplied) consisted of "[t]he testimony of the witnesses" and "[d]ocuments and other things received as exhibits." The court did not directly address the standard of care.

The jury ultimately found that J.R. had not met his burden of proof and rendered a general verdict in favor of Alegent. The court received and accepted the jury's verdict.

## III. ASSIGNMENTS OF ERROR

Although J.R. assigns seven errors, one is dispositive. J.R. assigns, restated, that the district court erred in giving instruction No. 10, which defined malpractice or professional negligence. J.R.'s assignment characterized the instruction as "improper, erroneous and confusing."

## IV. STANDARD OF REVIEW

[1] Whether a jury instruction is correct is a question of law, which an appellate court independently decides.[1]

[2] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[2]

[3] Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.[3]

## V. ANALYSIS

Although not objected to at trial, we agree with J.R. that it was plain error for the court to give the erroneous instruction to the jury that it could not consider expert testimony when determining the standard of care for malpractice or professional negligence. We reverse, and remand for a new trial on that ground. We do not address J.R.'s remaining assignments of error, since they are unnecessary to adjudicate the case and controversy before us.[4] The remaining assignments of error are also highly dependent upon the particulars of how the case was tried, and the case may be tried differently on remand.

[4] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[5] Outside of plain error review,

---

[1] *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021).

[2] *Id.*

[3] *Id.*

[4] See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

[5] *Kuhnel v. BNSF Railway Co.*, 287 Neb. 541, 844 N.W.2d 251 (2014).

we have held that a jury instruction that misstates the issues and has a tendency to confuse the jury is erroneous.[6]

More specifically, an instruction which misstates the law upon a vital issue is not cured by another which states the law correctly.[7] Other courts have explained that "'[w]here jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to plaintiff's claim, and a new trial is warranted.'"[8] Even a single erroneous instruction, if it is on a vital issue and is misleading, can vitiate an entire charge.[9]

In *State v. Edwards*[10] and *State v. Abram*,[11] we found plain error arising from typographical errors in instructions on vital issues. In *Edwards*, even though one instruction correctly provided that the State had the burden of proving each element beyond a reasonable doubt and that burden never shifted, an instruction on the defendant's affirmative defense of entrapment by estoppel erroneously stated, "'If you find the defendant did not prove each of the foregoing elements of the defense by the greater weight of the evidence, then you must find him guilty . . . .'"[12] We found plain error because the jury could have concluded that if the defendant failed to prove his affirmative defense, the jury was required to find him guilty. This implicated both the constitutional presumption of innocence and the State's burden of proof. We also said that an

---

[6] *Anderson v. Union Pacific RR. Co.*, 295 Neb. 785, 890 N.W.2d 791 (2017).

[7] *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867 (2016).

[8] *Murray v. UBS Securities, LLC*, 128 F.4th 363, 372 (2d Cir. 2025).

[9] See *Franks v. United States Lines Company*, 324 F.2d 126 (2d Cir. 1963). See, also, *Murray v. UBS Securities, LLC, supra* note 8.

[10] *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013).

[11] *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012).

[12] *State v. Edwards, supra* note 10, 286 Neb. at 410, 837 N.W.2d at 87.

instruction which withdraws from the jury an essential element in the case is prejudicial.[13]

In *Abram*, an instruction constituting plain error stated, "'The Defendant has an absolute right not to testify. The fact that the Defendant did not testify *must be* considered by you as an admission of guilt and must not influence your verdict in any way.'"[14] Even though the court read the instruction to the jury without the typographical error, adding the word "not" to state "must not be considered,"[15] we held a written instruction that on its face required the jury to consider the defendant's failure to testify as an admission of guilt was an error of constitutional magnitude, which was not harmless. We explained that the jury could have thought the instruction required it to consider the defendant as having admitted guilt by failing to testify.[16] Thus, the error was plainly evident from the record, prejudicially affected a substantial right of the defendant, and was of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[17]

In contrast, in the cases of *Fleming Realty & Ins., Inc. v. Evans*[18] (Fleming) and *Tidd v. Stull*,[19] we found that, evaluating the instructions as a whole in the context of the trial, the typographical errors in the instructions were not prejudicial.

In *Fleming*, we found an erroneous instruction was harmless when, in the elements of "'ready and able to buy,'" the court misstated "'if he has definitely arranged to raise the

---

[13] *State v. Edwards, supra* note 10.

[14] *State v. Abram, supra* note 11, 284 Neb. at 60, 815 N.W.2d at 902-03.

[15] *Id.* at 60, 815 N.W.2d at 903 (emphasis omitted).

[16] See *State v. Abram, supra* note 11.

[17] See *id.*

[18] *Fleming Realty & Ins., Inc. v. Evans*, 199 Neb. 440, 259 N.W.2d 604 (1977).

[19] *Tidd v. Stull*, 128 Neb. 506, 259 N.W. 369 (1935).

necessary money, or as much thereof as he is *able* to supply personally, by having a binding commitment for a loan.'"[20] The instruction should have read "'unable.'"[21]

In *Tidd*, we held that it was harmless error for an instruction to have the typographical error of stating "'plaintiff'" instead of "'defendant'" as follows: "'That the plaintiff appeared as such attorney in said suits and performed certain legal services for and on behalf of the *plaintiff*.'"[22] We said that while the instruction was technically erroneous, in reading the whole instruction and the others given, the jury was not misled.

Neither *Fleming* nor *Tidd* involved erroneous instructions on issues vital to the case, as was the State's burden of proof in *Edwards* or the defendant's right not to testify in *Abram*. In *Abram*, we distinguished the case from *Fleming* by noting *Fleming* was civil,[23] and it is more difficult in civil cases to satisfy the high bar of plain error for an erroneous jury instruction.[24] Nevertheless, in other civil cases we have found plain error stemming from erroneous jury instructions.

In *City of Wahoo v. NIFCO Mech. Systems*,[25] we found plain error from an instruction in a negligence action erroneously stating that if the plaintiff's negligence was more than slight or the defendant's was more than gross, then the verdict must be for the defendant, whereas if the plaintiff's negligence was slight and the defendant's was gross, the verdict must be for the plaintiff in accordance with percentages of fault. Despite another instruction properly describing comparative

---

[20] *Fleming, supra* note 18, 199 Neb. at 445, 259 N.W.2d at 607.

[21] *Id*. at 445, 259 N.W.2d at 608.

[22] *Tidd v. Stull, supra* note 19, 128 Neb. at 507, 259 N.W. at 370.

[23] See *State v. Abram, supra* note 11.

[24] See, *Hirlston v. Costco Wholesale Corp.*, 81 F.4th 744 (7th Cir. 2023); 75A Am. Jur. 2d *Trial* § 1173 (2018).

[25] *City of Wahoo v. NIFCO Mech. Systems*, 306 Neb. 203, 944 N.W.2d 757 (2020).

negligence, it was "not difficult to see how the jury could have been led astray" by the erroneous instruction in a manner "directly counter to the current comparative negligence law."[26] This deprived the plaintiff of its substantial rights and "failed to give effect to the Legislature's policy choice" that comparative negligence shall no longer be decided through the "'slight'" and "'gross'" formulation.[27]

In *Russell v. Stricker*,[28] we held it was plain error to fail to instruct the jury on allocation of negligence as is specifically mandated by statute.[29] We said that this instruction was not a matter of discretion and could not be waived and that doing so would undermine the will of the Legislature and result in damage to the integrity, reputation, and fairness of the judicial process.

Courts in other jurisdictions have found plain error in erroneous instructions on the standard of care in negligence actions.[30] For instance, in *Buccafusco v. Public Service Elec. & Gas Co.*,[31] a New Jersey court found plain error from an erroneous instruction stating that the standard of care in the negligence action was limited to industry standards and practices, without properly instructing that those standards and practices are not conclusive and that the defendant must still use reasonable care under all the circumstances, notwithstanding compliance with industry custom. Even though the court had

---

[26] *Id.* at 212, 944 N.W.2d at 763.

[27] *Id.* at 214, 944 N.W.2d at 764.

[28] *Russell v. Stricker*, 262 Neb. 853, 635 N.W.2d 734 (2001).

[29] See Neb. Rev. Stat. § 25-21,185.09 (Reissue 2016).

[30] See, *Riggins v. Mauriello*, 603 A.2d 827 (Del. 1992); *Goss v. Allen*, 134 N.J. Super. 99, 338 A.2d 820 (1975), *reversed* 70 N.J. 442, 360 A.2d 388 (1976). See, also, *Gonzalez v. Silver*, 407 N.J. Super. 576, 972 A.2d 436 (2009).

[31] *Buccafusco v. Public Service Elec. & Gas Co.*, 49 N.J. Super. 385, 140 A.2d 79 (1958).

at another point correctly defined the general standard of care in relation to industry custom, the court was "so inconsistent in its approach to the issue of negligence . . . that it thereby undoubtedly confused the jury so as to deny the plaintiff the right to have the question fully and fairly considered."[32]

As with any negligence claim, the applicable standard of care is a vital element of a medical malpractice claim. But unlike ordinary negligence actions, in a medical malpractice case, expert testimony is also vital for determining whether the defendant breached the standard of care.[33] In this case, the jury was asked to decide whether Alegent met the standard of care in the administration of Pitocin and the communication between Jones and the nursing staff relating to Morgan-Baker's clinical presentation during labor, including signs of tachysystole. There was some dispute in the expert testimony as to what constitutes tachysystole, with Alegent focusing on it being greater than five contractions in a 10-minute period averaged over a 30-minute period and the evidence that this occurred very little during Morgan-Baker's labor.

The jury was told it must apply the instructions even if it believed the law should be different. It was then instructed that it could not set its own standards in determining "ordinary and reasonable care" of a health care provider, which "must necessarily be established by expert witnesses"; however, the jury "shall not determine the standard of care . . . from the testimony of the expert witnesses."

While the first part of instruction No. 10 was correct, the jury was not necessarily alerted to any internal inconsistency, since it would not have necessarily equated "ordinary and reasonable care" with the "standard of care," "also referred to as the required skill and knowledge to be exercised." If the jury could not determine the standard of care through the jurors'

---

[32] *Id.* at 394, 140 A.2d at 84.

[33] See *Claiborne County Hosp. v. Truitt*, 335 So. 3d 562 (Miss. 2022).

own lay experience, and it could not determine it from witness testimony, the jury could have erroneously and prejudicially concluded it must determine the standard of care solely from the exhibits.

In fact, the jury specifically asked for clarification on this issue. It asked if, when considering the standard of care, it could consider all four definitions of tachysystole, as opposed to the one type of tachysystole used in the order set, which defined tachysystole as "5 contractions in 10 min[utes] over 30 min[utes] time." In response, the court referred the jury to an instruction generally describing the evidence from which the jury was "to find the facts." However, the jury could have distinguished the standard of care from determinations of what factually occurred during Morgan-Baker's labor.

It is plainly evident from the record that instruction No. 10 was erroneous and, further, that the jury was confused in a material way on a vital issue by the erroneous mandate that it "shall *not* determine the standard of care (also referred to as the required skill and knowledge to be exercised) from the testimony of the expert witnesses who testified in this case." (Emphasis supplied.) Because the correct standard of care is vital to a medical malpractice case, and the record demonstrates the jury was misled as to the correct way to determine the standard of care, we hold that erroneous instruction No. 10 prejudicially affected a substantial right of J.R. and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

Our opinion should not be read as determining that every mistake in an instruction regarding the standard of care in a medical malpractice case rises to the level of plain error. Here, the nature of the mistake and the full context in which it arose dictates that outcome. But one can easily envision circumstances that would not do so.

## VI. CONCLUSION

For the foregoing reasons, we reverse the judgment and remand the cause for a new trial.

Reversed and remanded for a new trial.

Funke, C.J., not participating.

Cassel, J., concurring.

I join the court's opinion and write separately only to express my skepticism that upon retrial, the package insert for Pitocin will be admissible as substantive evidence. There is a significant difference between employing an exhibit for impeachment and offering it as substantive evidence.