Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2026 08:07 AM CDT

Chaylea Cramer, appellee and cross-appellant, v.
Union Pacific Railroad Company, a Delaware
corporation, appellant and cross-appellee.

___ N.W.3d ___

Filed April 23, 2026.    No. S-24-960.

1. **Judgments: Pleadings: Appeal and Error.** A motion to alter or amend a judgment is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion.

2. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

3. **Jury Instructions: Proof: Appeal and Error.** In an appeal based upon a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

4. **Motions for New Trial: Appeal and Error.** A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion.

5. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

6. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and an appellate court reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.

7. **Federal Acts: Railroads: Claims: Courts.** A state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the Federal Employers' Liability Act, but substantive issues concerning a claim under the act are determined by the

provisions of the act and interpretive decisions of the federal courts construing the act.

8. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

9. ____: ____. Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.

10. **Appeal and Error: Words and Phrases.** Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

11. **Jury Instructions: Presumptions.** It is presumed a jury followed the instructions given in arriving at its verdict, and unless it affirmatively appears to the contrary, it cannot be said that such instructions were disregarded.

12. **Federal Acts: Jury Instructions.** An apportionment instruction is appropriate in a Federal Employers' Liability Act case where there is evidence of a preexisting condition but the degree to which that condition may have been aggravated could not be determined.

13. **Federal Acts: Jury Instructions.** In the absence of proof of aggravation by a preexisting condition, an instruction on apportionment in a Federal Employers' Liability Act would be inappropriate.

14. **Trial: Expert Witnesses.** When confronted with expert testimony, the trial court serves as a gatekeeper to ensure the opinions presented to the finder of fact are reliable and helpful.

15. ____: ____. In evaluating expert opinion testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.

16. ____: ____. The trial court must make a preliminary assessment whether the reasoning or methodology underlying an expert's testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Cathy S. Trent-Vilim, of Lamson Dugan & Murray, L.L.P., and Torry N. Garland and Betsy Seeba-Walters, of Union Pacific Railroad Company, for appellant.

Corey L. Stull and Nolan J. Niehus, of Atwood Law, P.C., L.L.O., for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Freudenberg, J.

## I. INTRODUCTION

This appeal arises from a jury verdict in a Federal Employers' Liability Act (FELA)[1] case. An employee of a railroad sued her employer after she injured her ankle descending the stairs at the railroad's dispatch center. The case proceeded to trial, where the jury returned a verdict finding the railroad was 5 percent at fault and the employee was 95 percent at fault and awarding $287,600 in damages to the employee. The railroad moved to amend the judgment, arguing that the court should, under 45 U.S.C. § 55 of FELA, set off from the judgment the short-term disability payments received by the employee and that the court should reduce the jury's damage award by 95 percent, allegedly to reflect the jury's finding of fault. The employee moved for a judgment notwithstanding the verdict and for a new trial, asserting that the court gave erroneous jury instructions on the issues of apportionment due to pre-existing injury and comparative fault. The employee also asserted that the court erroneously excluded a portion of her expert's opinion on lost future worklife capacity on the grounds that her expert's opinion lacked adequate foundation.

---

[1] See 45 U.S.C. § 51 et seq. (2018).

The trial court denied both parties' motions. The railroad appealed, and the employee cross-appealed. We moved the appeal to our docket.

## II. BACKGROUND

On August 14, 2017, Chaylea Cramer was employed as a dispatcher for Union Pacific Railroad Company (UP), and worked at UP's dispatch center in Omaha, Nebraska. As Cramer was descending a flight of stairs leading toward the restroom, she stepped on the transition between the terrazzo surface of the stairs and the carpeted surface, causing her to "roll[]" her left ankle. Cramer "walked it off" following the incident and continued with her shift. Cramer cared for her ankle at home that night and wore a brace to work the next day. Cramer met with a superior the next day who encouraged her not to report the incident. Cramer eventually went to see Dr. Scott McMullen, a foot and ankle orthopedist who had treated her in 2001 when she was a teenager for a prior injury to her left ankle. After Cramer's appointment with McMullen, she filled out a report of personal injury for UP.

After a few months of conservative treatment, including a walking boot, ankle brace, and cortisone shots, Cramer had surgery on her injured left ankle in January 2018. Cramer eventually underwent several surgeries on both her left and right ankles in the years following the incident.

Cramer filed suit against UP under FELA in July 2020. Cramer alleged that UP failed to furnish and provide her with a reasonably safe place to work, failed to maintain its walkways in a reasonably safe manner, and failed to design and maintain its stairwell properly. Cramer alleged that the incident caused her to sustain severe and disabling injuries that required extensive medical care and would require continuing medical care.

UP answered and admitted that Cramer was employed by UP and was working in furtherance of its business on August 14, 2017, but otherwise generally denied the allegations set forth

in Cramer's complaint. UP asserted the following affirmative defenses: Cramer's contributory negligence; Cramer's failure to mitigate; Cramer's injuries were caused, in whole or in part, by preexisting conditions; and UP could be entitled to a setoff due to benefits that were paid to Cramer.

As relevant to this appeal, the litigation revolved around the fault of the respective parties for Cramer's injuries, whether Cramer had a preexisting injury that caused or contributed to her injuries, whether Cramer's injuries would impact her ability to work in the future, and what damages, if any, Cramer was entitled to.

## 1. Trial

The case was tried before a jury over six days in July 2024.

### (a) Cramer's High Arch Foot Condition

Prior to trial, Cramer moved to exclude any argument, statement, testimony, evidence, implication, or suggestion that her damages should be reduced because of any preexisting condition. Cramer argued there was no evidence to a reasonable degree of medical certainty that any preexisting condition caused her left ankle injury. The court overruled this motion in limine.

At trial, McMullen testified as an expert for Cramer, and Dr. Peter Cimino, an orthopedic surgeon, testified as an expert for UP on the issue of Cramer's "pes cavus" foot condition. McMullen testified that "pes cavovarus," a form of pes cavus, is characterized by high arches and inwardly turned heels. There was conflicting testimony and evidence concerning whether Cramer's pes cavus condition made her more susceptible or contributed to the injury she suffered on August 14, 2017, and the subsequent surgeries on both ankles.

Exhibit 108, the office notes from Cramer's initial visit to McMullen in September 2017, was admitted into evidence. In the narrative discussing McMullen's physical examination of Cramer, McMullen noted that Cramer "has a cavovarus

posture." Congenital pes cavus was listed as an "[a]ctive [p]roblem[]." Cimino testified that congenital pes cavus is something that a person is born with that develops as the person grows. In the notes from Cramer's initial visit with McMullen, he stated an x ray showed that Cramer, "on the lateral view, does have a pes cavus posture."

McMullen testified that he had no memory or recollection of Cramer's presenting with pes cavus when he first treated her in 2001 but noted that it was present in both feet when he saw her again in September 2017 following the workplace incident. McMullen testified that pes cavus is not a condition that always requires treatment, but it requires treatment if it becomes symptomatic. McMullen and Cimino each testified that they had no information that Cramer's pes cavus had given her problems or was symptomatic between Cramer's 2001 ankle surgery and the August 14, 2017, incident. McMullen did testify, however, that Cramer's pes cavus existed before she suffered the ankle sprain at work in August 2017.

McMullen opined that Cramer's pes cavus did not cause the ankle injury Cramer suffered in August 2017 and did not necessitate the followup surgeries he performed on Cramer's ankles. On cross-examination, however, McMullen agreed that pes cavus can cause increased pressure, alter force distribution, and predispose people to roll their ankles when doing activities that require balance and stability, including descending stairs. Cimino similarly testified that having pes cavus is a "factor in sprained ankles" because the shape of a foot with pes cavus creates stress on the ligaments, making them easier to injure. Cimino testified that he was offering no opinions on the issue of apportionment as it pertained to Cramer's pes cavus foot condition but opined that, while Cramer's first surgery after the August 2017 incident was due to the incident, the subsequent surgeries were due to Cramer's existing degenerative pes cavus foot condition. McMullen and Cramer also testified that Cramer's ankle

"buckled" when she fell down the stairs at her in-laws' house in November 2017, after the incident at UP, but before her first postincident surgery.

### (b) Cramer's Comparative Fault

Another major issue at trial was whether Cramer was negligent and contributed to the incident that caused her to suffer the left ankle injury. There was no surveillance footage of when Cramer rolled her ankle, and no one witnessed the incident.

Cramer testified at trial about the nature of her work as a dispatcher at UP, explaining how important it is to be present and focused at the workstation. Cramer testified that if a dispatcher "wanted to go heat up . . . food or go to the restroom, you mentally hurried up quick, went there, handled what you needed to and you got back to your desk." Cramer further defined "mental hurry" as not "dilly-dallying" and "walking with the purpose of going to the restroom or heating up your food and getting straight back to your desk." A supervisor at UP also testified that dispatchers need to be attentive and try to take the most "direct and expeditious route" to and from the restroom.

When asked to describe the incident on August 14, 2017, Cramer explained that she got up to go to the restroom, held the handrail on the stairs with her right hand, and "walked down the stairs, normal stride." Then, when Cramer got to the landing of the stairs, she stepped down with her left foot and "it kind of felt squishy, and [her] ankle rolled from underneath" her. After she rolled her ankle, Cramer walked it off, inspected the area, used the restroom, and carried on with the rest of her shift. Cramer testified that she was not "physically rushing."

Exhibit 150, which was entered into evidence at trial, is a clinical consultation record from when Cramer saw UP's occupational health nurse on August 15, 2017, the day after the incident. According to that record, "[Cramer] stated she was in a hurry on 8/14/17 toward the end of her shift around

11-1130p [sic], stepped off of the last step of stairs wrong and tweaked her right [sic] ankle." At trial, Cramer acknowledged seeing a nurse the day after the incident and agreed that she used the term "hurry."

Exhibit 101, also entered into evidence, is UP's "Report of Personal Injury or Occupational Illness" form that was filled out and signed by Cramer about a month after she rolled her ankle descending the stairs. In the report, Cramer described the cause of the accident as her being "[i]n a hurry and I didn't notice the uneven footing." At trial, Cramer explained that by saying "in a hurry," she meant a "mental hurry." Another supervisor at UP who signed the report as a witness testified at trial that "[b]eing in a hurry is not necessarily wrong." The supervisor acknowledged that she did not offer any coaching to Cramer or reprimand Cramer for reporting that she was in a hurry.

In February 2018, Cramer gave a recorded interview with a UP risk management representative regarding the incident. During this interview, Cramer explained, "I was going to the restroom, I was going down the stairs to use the restroom so probably in a little bit of a hurry." Cramer clarified, "I wasn't in anymore of a hurry than I would have been on a normal day going to the restroom."

Dr. Terry Stentz, an expert in the fields of occupational safety health, ergonomics, and human factors, testified for Cramer and opined that Cramer's use of the handrail when descending the stairway would have made it "awfully hard to run down a set of stairs." Based on Stentz' examination of the stairs and review of the record, including Cramer's testimony about the incident, he opined that Cramer did not descend the stairs in an unsafe way and was not rushing.

### (c) McMullen's Testimony Regarding Future Lost Worklife Expectancy

Before trial, UP moved to exclude or limit McMullen's opinions related to Cramer's diminished worklife expectancy.

UP asserted that McMullen's opinion related to Cramer's lost worklife expectancy would not be sufficient to meet the standard for the admissibility of expert medical opinions because it lacked foundation and reliability. In support of this argument, UP attached to its motion McMullen's opinion report, which stated, "I believe that it is more likely than not" that Cramer's worklife expectancy would be diminished by approximately 15 years. Cramer responded to UP's argument by pointing out that McMullen's report stated that his opinion was based on a reasonable degree of medical certainty. Further, Cramer asserted that McMullen's opinion was based on adequate foundation and reliable methodology and was supported by an affidavit from McMullen. In his affidavit, McMullen stated that he formed an opinion on Cramer's future worklife expectancy based on his training, education, and experience. McMullen opined that Cramer's ability to work would be "diminished by approximately 15 years." After a hearing, the court took the matter under advisement but deferred a ruling until more evidence and testimony was presented.

At trial, in addition to testifying regarding Cramer's injuries and treatment over the years, McMullen sought to testify regarding Cramer's lost future worklife expectancy. McMullen was asked about if and how he determines whether a person is physically capable of going back to work, including how the progression of an injury might affect the person's job. This line of questioning drew an objection from UP, and the court sustained a foundation objection. McMullen was then asked if part of his practice involves making determinations of restrictions on patients when they return to work, as well as evaluating how they will progress over time, and he answered, "Yes."

Cramer's attorney next asked, "In this case, have you formed any opinions about whether . . . Cramer would, to a reasonable degree of medical certainty, will have a shortening of her worklife expectancy due to the injury she has sustained

on August 14, 2017?" This question again drew an objection from UP, and the court sustained a foundation objection. In response, Cramer's attorney asked if McMullen had reviewed all of Cramer's medical treatment records and functional capacity evaluation, to which McMullen replied that he had. Cramer's attorney then inquired about Cramer's ankle injury, the potential for the ankle's deterioration, and Cramer's job duties. Based on this questioning, Cramer's attorney asked, "[D]o you feel that you have the ability to give an opinion, to a reasonable degree of medical certainty, as to what the future will hold for . . . Cramer in terms of her work?" McMullen answered, "Yes." UP again objected on foundation grounds when McMullen was asked to provide his opinion on Cramer's future work. The court sustained UP's objection.

Cramer's attorney attempted to lay more foundation by asking McMullen how he came to the opinion that Cramer's worklife would be shortened. McMullen explained that he used his experience, education, and treatment of Cramer to arrive at his opinions. Cramer's attorney again asked what McMullen's opinion was on Cramer's future worklife expectancy, which drew another foundation objection.

The court then held a sidebar to discuss the foundation for McMullen's opinion. The court expressed concerns that McMullen's opinion on Cramer's lost worklife expectancy lacked a factual basis and there was no formula he was relying on. The court explained that general opinions about the injury's getting worse were permissible but giving opinions about the specific number of work years Cramer would lose due to the injury required more foundation. The court specifically stated that more foundation was needed in terms of methodology.

Following the sidebar, Cramer's attorney asked McMullen more general questions about his observing patients over time who had suffered similar injuries as Cramer and underwent similar procedures, as well as the progression of the problems they encountered, including at work. Counsel then turned to

questions about Cramer's and McMullen's understanding of her work, including how her ankle injury would impact her. When Cramer's attorney asked about whether McMullen used a specific formula, the court requested another sidebar.

During the second sidebar, the court again expressed concern with McMullen's offering a specific opinion about how many work years Cramer would lose out on due to her injury, without any formula or specific methodology. Following the second sidebar, Cramer's attorney asked, generally, if McMullen had an opinion about whether Cramer's worklife in the future will be affected by the injuries she sustained. McMullen answered that Cramer's "ability to continue at her current level of work will be shortened. It would not last until the typical retirement age, 65."

After the jury was excused for the day, Cramer's attorney made an offer of proof on McMullen's opinion regarding Cramer's lost worklife expectancy. During the offer of proof, Cramer's attorney asked McMullen if there is "any formula or anything that medical science has developed that allows [him]" to give opinions regarding the future worklife of his patients. McMullen responded, "Not that I know of or that I have utilized." McMullen then testified as part of the offer of proof that, based on his training, experience, and treatment of Cramer, Cramer's worklife would be shortened by approximately 15 years. At the conclusion of the offer of proof, the court reaffirmed its ruling on foundation as to McMullen's methodology in forming his opinion.

### (d) Damages

Throughout trial, there was testimony regarding Cramer's claimed damages. Stan Smith, who has a Ph.D. in economics, testified regarding Cramer's past lost wages from time spent recovering from her surgeries. Smith testified, based on his review of Cramer's wages and the time she missed, that Cramer's past lost wages were $41,691. In closing arguments,

Cramer's attorney requested that the jury award her $41,600 in past lost wages.

Smith also testified about Cramer's potential future lost wages due to her injuries. Smith opined that the actual amount of future lost wages would vary depending on promotions and how many years Cramer would lose out on due to the injuries. Smith created a table, which was used as a demonstrative exhibit at trial, to show how Cramer's lost wages would accumulate over time. In closing arguments, Cramer's attorney requested $1,137,951 in damages for future lost wages and lost pension benefits.

Finally, Smith testified regarding the value of Cramer's lost household services due to her injuries. Smith opined, based on an average value of services up to the life expectancy of 82.5 years, Cramer would be damaged by $1,345,128 in lost household services. Cramer's attorney asked for that amount in closing arguments.

In closing arguments, Cramer's attorney discussed Cramer's pain and suffering from the injuries she suffered and requested $3,119,812 in pain and suffering damages. In sum, Cramer's attorney asked for damages in the total amount of $5,644,491.

### (e) Presubmission Motions

Before the case was submitted to the jury, both Cramer and UP moved for directed verdicts. At the jury instruction conference, Cramer moved for a directed verdict on the issues of contributory negligence and apportionment due to a preexisting condition. The court overruled Cramer's motion.

UP first moved for a directed verdict on the issues of negligence and future wage loss following Cramer's presentation of evidence. The court overruled the motion on both issues. At the conclusion of the jury instruction conference, UP renewed its motion for directed verdict on negligence and future lost wages. The court overruled UP's renewed motion.

## 2. Jury Instructions

### (a) Instruction No. 2

Jury instruction No. 2 generally laid out Cramer's claim and UP's affirmative defenses and the applicable burdens of proof. UP's affirmative defenses of Cramer's comparative fault and preexisting conditions contributing to the incident and her injuries were included in instruction No. 2. At the jury instruction conference, Cramer objected to the inclusion of the paragraph regarding preexisting conditions contributing to the injury. The court overruled Cramer's objection, stating that the issue should be submitted to the jury.

### (b) Instruction No. 9

Jury instruction No. 9 included block quotes from 45 U.S.C. §§ 51 and 53 of FELA, along with five facts that the parties had stipulated as true. The block quote from 45 U.S.C. § 53 of FELA included in instruction No. 9 stated:

> "In all actions brought against any common carrier by railroad to recover damages for personal injuries to an employee, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

At the jury instruction conference, Cramer objected to the inclusion of the contributory negligence portion of instruction No. 9. The court overruled Cramer's objection, explaining that the instruction stated the law and was an affirmative defense for the jury to consider. UP offered a requested instruction that also quoted 45 U.S.C. § 53 of FELA but included a paragraph that stated "then the total award of damages to Cramer will be reduced by the court." The record does not indicate the court's consideration of UP's proposed instruction, and UP did not object to instruction No. 9 as given.

### (c) Instruction No. 14

Jury instruction No. 14 concerned Cramer's pes cavus foot condition and instructed the following:

> There is evidence that Cramer had bilateral pes cavus foot deformities before the August 14, 2017 incident. [UP] is liable only for any damages that you find to be caused by the August 14, 2017, incident.
>
> This is true even if the person's preexisting condition made her more susceptible to injury than a healthy person, and even if a healthy person may not have suffered any substantial injury cause [sic] by aggravation.
>
> If you cannot separate damages caused by the preexisting condition from those caused by the accident, then [UP] is liable for all of those damages.
>
> [UP] must prove this defense by the greater weight of the evidence.

(Emphasis omitted.) Cramer objected to instruction No. 14, arguing that it was not appropriate because there was no evidence to support it. Cramer also proposed an instruction that stated that "an asymptomatic condition prior to the accident does not warrant apportionment." The court overruled Cramer's objections and gave the instruction as quoted above.

### (d) Verdict Form No. 3

The jury was given three verdict forms, with instructions to complete only one. The jury was instructed to complete verdict form No. 1 if it found Cramer failed to prove her claim by the greater weight of the evidence. Verdict form No. 2 was to be completed if Cramer had proved her claim by the greater weight of the evidence and UP had not proved any of its defenses set forth. Verdict form No. 3 was to be completed if both Cramer and UP had proved their claim and any defense, respectively, by the greater weight of the evidence. Additionally, the jury was instructed that, if it were to complete verdict form No. 3, that Cramer's damages "if any, must be reduced proportionally."

Verdict form No. 3 instructed the jury to first consider Cramer's damages in six categories: past wage loss, present value of lost future earnings, pain and suffering, present value of lost household services, and future value of loss of household services. The jury was then to apportion the negligence of Cramer and UP to total 100 percent.

At the jury instruction conference, Cramer objected to verdict form No. 3 in its entirety. UP objected to the initial form of verdict form No. 3, which did not include itemized damage categories. UP also requested a line for the jury to provide a percentage for preexisting injury and to have the court reduce the verdict by that percentage. Cramer objected to this request, arguing that it was contrary to instruction No. 14. The court responded that the instructions already told the jury to reduce the damages.

### (e) Jury's Question

During deliberations, the jury submitted a question to the court, asking: "Does the amount for % of negligence correlate to plaintiff's damages?" After a brief discussion with counsel for both parties, the court generally referred the jury back to the instructions already provided.

### 3. Jury Verdict

On July 15, 2024, the jury returned a verdict finding that both Cramer and UP had met their burdens of proof. Accordingly, the jury completed verdict form No. 3. The jury found that Cramer was damaged in the following categories for the following amounts: past wages loss to date of trial ($41,600), present value of lost future earnings ($0), pain and suffering to date of trial ($135,000), future pain and suffering ($90,000), present value of lost household services ($21,000), and future loss of household services ($0). The damages awarded by the jury amounted to $287,600. The jury found that Cramer was 95 percent negligent and that UP was 5 percent negligent.

IN THE NEBRASKA DISTRICT COURT OF DOUGLAS COUNTY

CHAYLEA CRAMER,      )      CASE NO. 20-5790
                         )
       Plaintiff,      )
                         )
v.                    )      **VERDICT FORM NO. 3**
                         )
UNION PACIFIC RAILROAD      )
COMPANY,                  )
                         )
       Defendant.      )

We, the jury, find that both Plaintiff Chaylea Cramer and Defendant Union Pacific *have* met their burdens of proof. We answer the questions on this Verdict Form as follows:

Plaintiff's damages:

| | | |
|---|---|---|
| A. Past wage loss to date of trial: | $ | 41,600 |
| B. Present value of lost future earnings: | $ | 0 |
| C. Pain and suffering to date of trial: | $ | 135,000 |
| D. Future pain and suffering: | $ | 90,000 |
| E. Present value of lost household services: | $ | 21,000 |
| F. Future value of loss of household services: | $ | 0 |

LIST OF PERCENTAGES:

What percent of the negligence was the Plaintiff's?
     95 %

What percent of the negligence was the Defendant's?
     5 %



#19 FILED
District Court
DOUGLAS COUNTY, NEBRASKA
JUL 1 5 2024
CLERK DISTRICT COURT

TOTAL: 100%

The court received and accepted the jury's verdict.

### 4. POSTVERDICT MOTIONS

Each party made postverdict motions. Cramer moved for a new trial and for judgment notwithstanding the verdict. Cramer asserted that a new trial was warranted because the court erred by instructing the jury on the issue of apportionment in instruction No. 14. Cramer further argued that the jury's assessment that she was 95 percent at fault was not sustained by sufficient evidence. Cramer also argued that the

jury improperly reduced her damages, asserting that it was the court's role to do so. Finally, Cramer argued a new trial was warranted because of the allegedly erroneous exclusion of McMullen's testimony regarding Cramer's lost worklife expectancy. Cramer asserted that a judgment notwithstanding the verdict was proper because the jury's finding that her preexisting condition supported apportionment was not reasonable and the jury's finding that she was contributorily negligent was not reasonable.

The court denied both of Cramer's motions following a hearing. In denying Cramer's motion for a new trial, the court found that the evidence was sufficient to support an apportionment instruction, the question of Cramer's negligence was a jury question, the jury properly reduced the damages award, and the exclusion of McMullen's opinion on lost work-life expectancy was warranted. In denying Cramer's motion for judgment notwithstanding the verdict, the court similarly found that the evidence of apportionment and the question of Cramer's negligence were properly left to the jury.

UP moved to amend the judgment. UP argued that the court should reduce the jury's $287,600 damage award to reflect Cramer's 95-percent fault as found by the jury. UP also argued, under 45 U.S.C. § 55 of FELA, that it was entitled to a setoff in the amount of $33,048.60, which represented the amount Cramer received from UP in short-term disability payments from UP's self-funded disability plan.

In relevant part, 45 U.S.C. § 55 of FELA provides that "in any action brought against [a] common carrier under . . . any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee." In relation to UP's motion to amend the judgment, both parties introduced exhibits regarding UP's short-term disability plan. The purpose of the short-term disability plan, as described in the plan itself, is to provide continued income for a UP employee if illness or injury prevents

the employee from working. The short-term disability plan states, "The Plan shall automatically have a lien against Other Income Replacement Benefits." "Other Income Replacement Benefits" are defined in UP's "Employee Flexible Benefits Guide" as including "[w]orkers [sic] compensation or a similar law which provides periodic benefits." Further, under the language of the short-term disability plan, an employee is required to sign a "'Reimbursement Agreement,'" which acknowledges "the [short-term and long-term disability] Plan's right to funds obtained from any recovery [the employee] receive[s]."

After a hearing on UP's motion, the court denied the motion to amend the judgment. The court relied on the plain language of 45 U.S.C. § 53, which provides that "the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee," to deny UP's request to amend the jury's damage award. The court found that the short-term disability payments made by UP to Cramer were considered "fringe benefits" and were thus not entitled to setoff.

Both UP and Cramer filed notices of appeal on the same day. We moved the case to our docket.

III. ASSIGNMENTS OF ERROR

On appeal, UP asserts that the district court erred (1) in denying its motion to amend the judgment to reduce the amount of the verdict in accordance with Cramer's percentage of fault and (2) in denying its motion to amend the judgment to set off the verdict by the amount of short-term disability payments that were paid to Cramer.

On cross-appeal, Cramer assigns, consolidated and restated, that the district court erred (1) in submitting UP's affirmative defense of apportionment of damages to the jury and denying Cramer's motion for a new trial as a result of erroneously submitting the apportionment defense to the jury, (2) in submitting UP's affirmative defense of comparative fault to the jury

and in denying Cramer's motions for judgment notwithstanding the verdict and for a new trial as a result of erroneously submitting the comparative fault defense to the jury, and (3) in finding McMullen lacked the foundation to testify to Cramer's lost worklife expectancy.

## IV. STANDARD OF REVIEW

[1] A motion to alter or amend a judgment is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion.[2]

[2,3] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[3] In an appeal based upon a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[4]

[4,5] A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

[6] We review de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and we review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[7]

---

[2] *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018).

[3] *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

[4] *Id*.

[5] *132 Ventures v. Active Spine Physical Therapy*, 318 Neb. 64, 13 N.W.3d 441 (2024).

[6] *Id*.

[7] *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023).

## V. ANALYSIS

UP asserts that the district court erred when it denied UP's motion to amend the judgment to (1) reduce Cramer's damage award by 95 percent to reflect what UP asserts is the jury's finding of Cramer's fault and (2) set off $33,048.60 from the judgment pursuant to payments that were made to Cramer as part of UP's short-term disability plan. Cramer, for her part, asserts the district court erred in instructing the jury on issues of apportionment and comparative fault and in excluding McMullen's opinion on the specific number of work years Cramer would lose due to her injuries.

[7] We address each of these arguments in turn. As a threshold matter, we observe that a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by FELA, but substantive issues concerning a claim under FELA are determined by the provisions of the act and interpretive decisions of the federal courts construing FELA.[8]

### 1. Jury Diminution of Damage Award

UP's argument that the district court erred in denying its motion to amend the judgment to reduce the jury's damage award is essentially twofold: (1) the jury did not reduce Cramer's damages in proportion with her fault because it did not understand the instructions and (2) the district court should have reduced the jury's award of damages.

Consistent with its lack of objection to any of the instructions or to the special verdict form (other than the addition of itemized damages), UP does not argue that the instructions incorrectly stated the law, were misleading, or inadequately covered the issues supported by the pleadings and the evidence. Nevertheless, UP points to verdict form No. 3 as being

---

[8] See *Ballard v. Union Pacific RR. Co.*, 279 Neb. 638, 781 N.W.2d 47 (2010).

amenable to misinterpretation, by setting forth a section for the jury to award Cramer's damages in distinct categories before having the jury assign percentages of fault. Then, as evidence that the jury was confused, UP highlights the jury's question submitted during deliberations and points out that the award of $41,600 in past lost wages was the same amount Cramer sought in closing arguments. UP contends that to avoid any possible confusion, the court, sua sponte, should have simply instructed the jury that it would reduce Cramer's damages after the jury determined fault. We disagree.

[8-10] It is well established that all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[9] Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.[10] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[11]

[11] It is presumed a jury followed the instructions given in arriving at its verdict, and unless it affirmatively appears to the contrary, it cannot be said that such instructions were disregarded.[12] Absent such showing, appellate courts "'properly avoid such [speculative] explorations into the jury's sovereign

[9] *State v. Tvrdy, supra* note 3.

[10] *J.R.M.B. v. Alegent Creighton Health*, 319 Neb. 287, 21 N.W.3d 678 (2025).

[11] *Id.*

[12] *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

space.'"[13] As such, "'a verdict will not be upset on the basis of speculation' about possible jury confusion."[14]

We do not find plain error in the instructions given. Read together, the jury instructions properly stated the law under FELA and properly instructed the jury on how to determine fault and apportion damages.

The jury instructions first instructed the jury to reduce Cramer's damages in proportion to her fault. Instruction No. 9 included language quoted from 45 U.S.C. § 53 of FELA, which provides, in relevant part: "[T]he fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." Next, instruction No. 2 provided that if both Cramer and UP had proved their claim and defenses, respectively, "then [Cramer's] damages, if any, must be reduced proportionally and [the jury] will fill out Verdict Form No. 3." The relevant instructions correctly stated the law, were not misleading, and adequately covered the issues supported by the pleadings and the evidence.

And UP has failed to affirmatively show that the jury failed to follow these instructions when reaching its verdict. UP offers three arguments in an attempt to show that the jury did not understand the instructions and did not follow the instructions, each of which we find unpersuasive.

First, UP states it is "reasonable to assume" that the jury determined Cramer's damages before apportioning fault, because that is how the order of the section regarding damages appeared on verdict form No. 3.[15] Again, UP did not object to

---

[13] *Helmer v. Goodyear Tire & Rubber Co.*, 828 F.3d 1195, 1200 (10th Cir. 2016) (quoting *Yeager v. United States*, 557 U.S. 110, 129 S. Ct. 2360, 174 L. Ed. 2d 78 (2009)).

[14] *Allen v. Minnstar, Inc.*, 97 F.3d 1365, 1373 (10th Cir. 1996) (quoting *Howard D. Jury, Inc. v. R & G Sloane Mfg. Co.*, 666 F.2d 1348 (10th Cir. 1981)).

[15] Brief for appellant at 18.

the order of the section regarding damages and fault on the verdict form, and the verdict form was not plain error. We will assume the jury read verdict form No. 3 in conjunction with the instructions to the jury to reduce Cramer's damages in proportion with her fault.

Second, UP highlights that the jury's damage award included $41,600 in damages for lost past wages, which was the same amount asked for by Cramer in closing arguments. However, as Cramer points out, $41,600 was just a part of the $287,600 total damage award; indeed, the $287,600 total damage award represents only approximately 5 percent of Cramer's requested damages of $5,644,491.

Third, UP points to the jury's question during deliberations as evidence that the jury did not understand the instructions. UP agreed, at the time, with the court's decision to direct the jury generally back to the instructions, but now implies that decision was inadequate. Regardless, such inquiries by jurors into the instructions are insufficient in themselves to justify intruding into the jury's sovereign space and upset its verdict.[16]

Even considering all three arguments together, UP has failed to affirmatively rebut the presumption that the jury followed the instructions when it reached its verdict and awarded damages.

UP also argues the court should have instructed the jury that it would reduce Cramer's damages based on its finding of fault. In other words, UP seems to suggest that the jury should not have been tasked with reducing Cramer's damages in proportion with her fault in the first place. While UP offered a proposed instruction with such language, UP ultimately did not object to instruction No. 9 as given, which instructed the jury to diminish Cramer's damages in proportion to her fault. Thus, UP must show plain error. It has not.

---

[16] See *Allen v. Minnstar, Inc., supra* note 14.

UP relies upon the common practice in Nebraska negligence cases where the jury determines fault and the court calculates the reduction in damages in proportion with the fault finding.[17] UP also relies on the unpublished opinion of the U.S. District Court for the Eastern District of Pennsylvania in *Bauder v. Philadelphia, Bethlehem, & New England R. Co.*[18] for the proposition that it would have been proper for the court to reduce Cramer's damage award. In *Bauder*, the trial court explicitly instructed that the jury was to make findings of fault, and the trial court would then reduce the damage award pursuant to that finding.[19] On appeal, the *Bauder* court rejected the argument that it was error under 45 U.S.C. § 53 of FELA to instruct the jury that the judge would reduce the damages.[20]

UP's reliance on this law is misplaced. As UP acknowledges, FELA is governed by federal law and not by Nebraska negligence law.[21] Regardless, the issue in this appeal is not whether the court could have elected to conduct the relevant reduction of damages itself, but if it was error to have the jury reduce the damages instead.

UP does not actually suggest it is improper under FELA for a jury to make this decision. Instead, UP's argument on this point appears to be another approach at undermining the jury's decision that it disagrees with. UP conceded to instructing the jury on reducing damages in proportion with its findings of fault. Once the jury rendered its verdict under the special verdict form, it was too late to give that issue to the judge instead.

---

[17] See NJI2d Civ. 5.05.

[18] *Bauder v. Philadelphia, Bethlehem & New England R. Co.*, No. CIV. 96-7188, 1998 WL 633651 (E.D. Penn. Aug. 28, 1998) (unpublished memorandum opinion).

[19] See *id*.

[20] See *id*.

[21] See *Ballard v. Union Pacific RR. Co., supra* note 8.

The district court did not err in denying UP's motion to amend the judgment. At their core, UP's arguments offer mere speculation into the jury's deliberative process in order to nullify the calculation that UP had agreed the jury, not the judge, should determine. Because UP cannot show that the jury failed to follow the instructions by failing to reduce Cramer's damages in proportion with her fault, the district court did not abuse its discretion in denying UP's motion to amend the judgment to reduce Cramer's damage award.

## 2. Short-Term Disability Payments

We also find no merit to UP's argument that the jury verdict should be altered to set off $33,048.60, which represents the amount of short-term disability payments that were made to Cramer while she was recovering from surgery. We agree with Cramer that the district court properly found UP's short-term disability plan language did not express an intent to indemnify UP against FELA liability; therefore, such payments were not subject to setoff.

According to 45 U.S.C. § 55 of FELA, an employer is allowed to set off from a judgment any sum it has contributed that has been paid to the injured employee "on account of the injury," as long as the employer is not seeking to totally avoid liability.[22] That section of FELA provides in full:

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: Provided, [t]hat in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured

---

[22] *Clark v. Burlington Northern, Inc.*, 726 F.2d 448 (8th Cir. 1984).

employee or the person entitled thereto on account of the injury or death for which said action was brought.[23] "The purpose of the FELA setoff provision is to prevent the imposition upon an employer of double liability, as the employer need not pay twice for the same damages."[24]

Courts have read the scope of the setoff provision in 45 U.S.C. § 55 as limited by its requirement that the payments subject to setoff be made "'on account of the injury.'"[25] The cases thus "draw a distinction between payments emanating from a fringe benefit such as a retirement fund or a general hospital and medical insurance plan, and payments [that] the employer has undertaken voluntarily *to indemnify itself against possible liabilities*" under FELA.[26]

The important consideration is the character of the benefits received by the employee, rather than whether the source of the funds is actually independent of the employer.[27] If the employee receives benefits from the employer with the purpose of indemnifying the employer against FELA liability for job-related injuries, the payments are likely subject to setoff.[28] If, however, the benefits are not related to FELA indemnification, they are likely exempt from setoff.[29]

Accordingly, a key factor in determining if disability benefits should be set off from a damage award is whether a railroad expresses a clear intent to avoid double liability under FELA based on the language of the plan at issue.[30] The

---

[23] 45 U.S.C. § 55 (emphasis omitted).

[24] *Andrews v. Norfolk Southern Railroad Corp.*, 2017 IL App. (1st) 153007, ¶16, 77 N.E.3d 1028, 1033-34, 413 Ill. Dec. 221, 226-27 (2017).

[25] *Clark v. Burlington Northern, Inc., supra* note 22, 726 F.2d at 450.

[26] *Id.* (emphasis supplied).

[27] *Clark v. Burlington Northern, Inc., supra* note 22.

[28] See *id.*

[29] See *id.*

[30] See *id.*

purpose and nature of insurance benefits are controlling when determining whether setoff is proper and, "for that determination[,] courts look to any collective bargaining agreement between the parties and the text of the insurance or disability plan itself."[31]

For example, in *Clark v. Burlington Northern, Inc.*,[32] a FELA case, the U.S. Court of Appeals for the Eighth Circuit affirmed setoff of an employee's damage award by the amount the employee received in long-term and short-term disability payments, because the plain language of the railroad's disability plans explicitly stated that the employee's benefits would be "'decreased'" or "'reduced'" by any amount or benefit paid to the employee under "'[workers'] [c]ompensation or Occupational Disease Act or [FELA].'"[33] The court found that this language showed the railroad's clear intent to avoid double liability under FELA.[34]

In *Fogg v. National R.R. Passenger Corp.*,[35] the District of Columbia Court of Appeals found that long-term disability payments were subject to setoff under FELA where the text of the disability plan provided a "'Reduction of Monthly Income Benefit,'" which was defined to include "'[a]ny periodic cash payments provided on account of your disability: . . . under or on account of any [workers'] compensation or similar law.'"[36] While the plan did not explicitly reference FELA, the court read the reference to "'similar law'" in the railroad's plan to include FELA.[37] Relying, in part, on secondary authority,

---

[31] *Fogg v. National R.R. Passenger Corp.*, 585 A.2d 786, 792 (D.C. App. 1991).

[32] *Clark v. Burlington Northern, Inc., supra* note 22.

[33] *Id.* at 451 n.3.

[34] See *Clark v. Burlington Northern, Inc., supra* note 22.

[35] *Fogg v. National R.R. Passenger Corp., supra* note 31.

[36] *Id.* at 792 (emphasis omitted).

[37] See *id.* at 793.

the court elaborated that FELA, "for practical purposes," serves as the workers' compensation remedy for covered railroad employees.[38]

On the other hand, in *Brady v. National R.R. Passenger Corp.*,[39] the U.S. District Court for the District of Connecticut, also looking to the text of a railroad's disability plan, found that the language "'[workers'] compensation or similar law'" did not show the railroad's intent to protect itself from double liability under FELA. The court in *Brady* explained that workers' compensation and FELA are similar in their remedial purpose but different in most other material aspects.[40] Further, the court found it difficult to believe the railroad would use such ambiguous language to express its intent to avoid double liability under FELA.[41] Where there was no other language indicating an intent that any possible FELA award be set off by payments under the disability plan, the court therefore found that the railroad was not entitled to a setoff.[42]

Following the decisions in *Fogg* and *Brady*, the U.S. Supreme Court clarified, albeit in a different context, that FELA is not similar to a workers' compensation scheme. The Court explained, "'The basis of [FELA] liability is [the employer's] negligence, not the fact that injuries occur.'"[43]

---

[38] *Id.* (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 80 (5th ed. 1984)).

[39] *Brady v. National R.R. Passenger Corp.*, 714 F. Supp. 601, 603 (D. Conn. 1989) (emphasis omitted).

[40] See *id.*

[41] See *id.*

[42] See *id.*

[43] *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994) (quoting *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 67 S. Ct. 598, 91 L. Ed. 572 (1947)). See, also, *Fogg v. National R.R. Passenger Corp., supra* note 31 (Rogers, C.J., concurring in part and dissenting in part).

UP's disability plan provides setoff for "any Other Income Replacement Benefits directly payable to [an employee] from any other State, Federal, Railroad Retirement Board, or other income benefit program." "Other Income Replacement Benefits" are then defined to include income received from disability under "[w]orkers [sic] compensation or a similar law *which provides periodic benefits*." (Emphasis supplied.) Unlike the plan in *Clark* and similarly to the plan in *Brady*, UP's disability plan makes no mention of FELA. Further, UP's plan adds the phrase "which provides periodic benefits" to the language of the plans in *Fogg* and *Brady*. Regardless of whether FELA could otherwise be considered a "similar law" to workers' compensation, the phrase "provides periodic benefits," read in its ordinary grammatical context, modifies "a similar law." And FELA does not provide periodic benefits. FELA is a remedy in tort that provides for recovery of lump-sum damages.[44] UP also points to the language in its plan providing that an employee seeking long-term or short-term disability payments must sign a "'Reimbursement Agreement'" acknowledging the plan's "right to funds obtained from any recovery [the employee] receive[s]." This language, applicable to any injured employee, whether through a workplace injury or otherwise, does not show an intent to avoid double liability under FELA. UP also did not provide a "'Reimbursement Agreement'" that was signed by Cramer related to her receipt of short-term disability payments. As such, the plain language of UP's disability plan with Cramer did not provide for setoff against FELA liability. Nothing in the language of UP's disability plan expressed the clear intent to indemnify UP against FELA liability.

The disability payments fell under a general medical insurance plan not related to FELA indemnification, and the plain language of the plan does not contemplate setoff otherwise

---

[44] See 45 U.S.C. § 51.

indemnifying UP against FELA liability for job-related inju-ries. As a result, the district court did not abuse its discretion in denying UP's motion to amend the judgment to set off $33,048.60 from Cramer's past lost wages.

### 3. Apportionment

We turn next to Cramer's cross-appeal. Cramer argues the district court erred in submitting UP's affirmative defense of apportionment to the jury because (1) UP did not offer an expert opinion on the issue of apportionment and (2) her pre-existing condition was not symptomatic.

Initially, we note that Cramer and UP dispute whether Cramer's pes cavus condition was symptomatic at the time of the incident. Cramer emphasizes that she did not need treatment for her high arches before the incident and that she did not suffer any pain before the incident. UP points out that Cramer suffered from chronic instability in her left ankle due to her pes cavus and the 2001 surgery.

[12,13] We have held that an apportionment instruction is appropriate in a FELA case where there is evidence of a pre-existing condition but the degree to which that condition may have been aggravated could not be determined.[45] We have also held that in the absence of proof of aggravation by a pre-existing condition, an instruction on apportionment in a FELA case would be inappropriate.[46]

Similarly, a federal court has held that "when a defendant's negligence aggravates a plaintiff's pre-existing health condi-tion, the defendant is liable only for the additional increment caused by the negligence and not for the pain and impairment that the plaintiff would have suffered even if the accident had never occurred."[47] If a defendant cannot show a reasonable

---

[45] See *Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d 212 (1997).

[46] See *id.*

[47] *Stevens v. Bangor and Aroostook R.R. Co.*, 97 F.3d 594, 601 (1st Cir. 1996).

basis for determining which damages were caused by the preexisting condition and which were caused by the accident at issue, the defendant is liable for the whole.[48]

We find no merit to Cramer's assertion that UP needed to present expert testimony of apportionment in order to submit the question of whether it had proved some of Cramer's damages were caused by her preexisting condition. Instead, we agree with other courts that have held there need not be "expert testimony precisely apportioning the injury on a percentage basis between preexisting conditions and prior accidents."[49] Evidence regarding the extent to which an injury is attributable to a preexisting condition "need only be sufficient to permit a rough practical apportionment."[50] Accordingly, "When there is evidence that defendant's negligence aggravated a preexisting condition but expert testimony does not precisely apportion the injury, apportionment is an issue for the jury."[51] While "apportionment may be difficult, like comparative negligence it is a question for which juries are well suited."[52]

We also disagree with Cramer's apparent argument that a preexisting condition must be symptomatic at the time of an accident for an apportionment instruction to be properly given. Cramer asserts that *Maurer v. United States*,[53] a Public Vessels Act case, stands for the proposition that "[a] defendant can only apportion damages from an injury if the defendant can show the plaintiff was incapacitated or disabled prior to the accident."[54] But that proposition is one of

---

[48] See *id.*

[49] *Sauer v. Burlington Northern R. Co.*, 106 F.3d 1490, 1494 (10th Cir. 1996).

[50] *Id*.

[51] *Id*.

[52] *Id*.

[53] *Maurer v. United States*, 668 F.2d 98 (2d Cir. 1981).

[54] Brief for appellee on cross-appeal at 40.

two exceptions to the general rule that a defendant takes the plaintiff as he finds him.[55] The second exception to the general rule identified in *Maurer* is, "when a plaintiff has a pre-existing condition that would inevitably worsen, a defendant causing subsequent injury is entitled to have the plaintiff's damages discounted to reflect the proportion of damages that would have been suffered even in the absence of the subsequent injury."[56]

Further, federal FELA cases do not require a showing that the plaintiff is symptomatic to support an apportionment jury instruction. In *McLaughlin v. BNSF Ry. Co.*,[57] the Colorado Court of Appeals explained that an apportionment instruction may be appropriate where there is evidence that a plaintiff reinjured an injury that had fully resolved prior to the incident at issue. Likewise, in *Sauer v. Burlington Northern R. Co.*,[58] the U.S. Court of Appeals for the 10th Circuit found there was sufficient evidence to support an apportionment instruction where there was evidence that a plaintiff had degenerative changes in his back, which made him more susceptible to injury, despite the fact that the plaintiff "had few symptoms and no significant disability from his preexisting back condition prior to the accidents."[59] The court also found an apportionment instruction was supported by testimony that the plaintiff's degenerative condition would have possibly worsened over time without the workplace accidents.[60]

Here, there was sufficient evidence to support the apportionment instruction, because, even if Cramer's pes cavus was not symptomatic in the timeframe preceding the injury, there was

---

[55] See *Maurer v. United States, supra* note 53.

[56] *Id.* at 100.

[57] *McLaughlin v. BNSF Ry. Co.*, 300 P.3d 925 (Colo. App. 2012).

[58] *Sauer v. Burlington Northern R. Co., supra* note 49.

[59] *Id.* at 1495.

[60] See *Sauer v. Burlington Northern R. Co., supra* note 49.

evidence that her pes cavus foot condition is a degenerative condition that creates stress on the ankle ligaments and makes it more likely she would roll her ankle. McMullen and Cimino each explained that pes cavus is characterized by high arches and inwardly turned heels. McMullen testified that Cramer's pes cavus predated the August 2017 ankle injury. There was also evidence, as similarly discussed in *McLaughlin*, that Cramer reinjured the same ankle that had been surgically repaired in 2001 and that McMullen's first postincident surgery was a revision of the same surgery performed on the same ankle in 2001. Finally, there was testimony that Cramer fell down the stairs at her in-laws' house in late 2017, after the workplace incident but before the first postincident surgery. While the evidence was conflicting as to what role, if any, Cramer's pes cavus played in her August 2017 ankle injury and several subsequent surgeries, the issue of apportionment was properly left to the jury.

The district court did not err in instructing the jury on apportionment and did not abuse its discretion in denying Cramer's motion for a new trial based on the apportionment instruction.

### 4. Comparative Fault

The district court also did not err in submitting UP's affirmative defense of comparative fault to the jury, because UP submitted sufficient evidence to support that theory. FELA is a pure comparative negligence scheme.[61] When the issue of comparative or contributory negligence is raised, a defendant has the burden of proving comparative or contributory negligence and is entitled to a jury instruction on this issue if there is any evidence to support that theory.[62] Cramer does not take issue with the correctness of the language contained

---

[61] See *Fashauer v. New Jersey Transit Rail Operations*, 57 F.3d 1269 (3d Cir. 1995). See, also, *Consolidated Rail Corporation v. Gottshall, supra* note 43.

[62] See *Meyers v. Union Pacific R. Co.*, 738 F.2d 328 (8th Cir. 1984).

in instruction No. 9 on contributory negligence, which is from 45 U.S.C. § 53 of FELA.

In the context of FELA, contributory negligence is a careless act or omission on a plaintiff's part tending to add new dangers to conditions that an employer negligently created or permitted to exist.[63] "Since [the] issues of the plaintiff's conduct and of damages usually are interwoven in FELA actions, the issue of damages is rarely submitted to a jury without also allowing the jury to consider the question of contributory negligence."[64]

When there is evidence of a plaintiff's lack of due care, regardless whether it is compelling or contested, the plaintiff's negligence is a question for the jury to consider.[65] For example, in *Lillie v. U.S.*,[66] a Federal Tort Claims Act case, the U.S. Court of Appeals for the 10th Circuit found that evidence of a plaintiff's hurrying down stairs showed a lack of ordinary care and supported a comparative negligence defense for the finder of fact to consider.

Here, Cramer points to her testimony that she was not rushing and the fact that she was not reprimanded for any wrongdoing associated with the accident. However, in exhibits 101, 150, and 162, Cramer herself explained she was in a "hurry" when she descended the stairs and rolled her ankle. Cramer attempted at trial to distinguish a "mental hurry" from a physical hurry. But the jury could have reasonably inferred a lack of due care either from evidence that Cramer was in a physical hurry or from evidence that she was distracted by a "mental hurry" when she descended the stairs.

---

[63] *Taylor v. Burlington Northern R. Co.*, 787 F.2d 1309 (9th Cir. 1986).

[64] *Norfolk Southern Ry. Co. v. Thomas*, 258 Va. 516, 521, 522 S.E.2d 620, 623 (1999). See, also, *Gustafson v. Burlington Northern RR. Co., supra* note 45.

[65] See *Gustafson v. Burlington Northern RR. Co., supra* note 45.

[66] *Lillie v. U.S.*, 40 F.3d 1105 (10th Cir. 1994).

Because both parties presented evidence on the issue of Cramer's alleged fault, a jury instruction on the issue of contributory negligence was warranted and the question of whether Cramer contributed to the accident was properly presented to the jury.

## 5. McMullen's Lost Worklife
### Expectancy Opinion

Finally, we find that the district court did not err in sustaining UP's *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[67]/ *Schafersman v. Agland Coop*[68] objection to Cramer's attempts to adduce McMullen's expert opinion that the accident shortened Cramer's worklife expectancy by 15 years. At trial, McMullen was allowed to testify generally that Cramer's worklife will be shortened due to her injuries. We review de novo whether the district court applied the correct legal standards for admitting an expert's testimony, and we review for an abuse of discretion how the district court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[69]

[14-16] When confronted with expert testimony, the trial court serves as a gatekeeper to ensure the opinions presented to the finder of fact are reliable and helpful.[70] In evaluating expert opinion testimony under *Daubert/Schafersman*, where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.[71]

---

[67] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[68] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[69] *Carson v. Steinke, supra* note 7.

[70] *Schafersman v. Agland Coop, supra* note 68.

[71] *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019).

The trial court must make a preliminary assessment whether the reasoning or methodology underlying an expert's testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.[72]

In *Kempf Contracting Design v. Holland-Tucker*,[73] the Indiana Court of Appeals found it was error for the trial court to allow expert testimony on lost worklife expectancy without establishing that the expert's opinion was based on a sufficiently reliable methodology. The court there found issue with the expert's lack of specific standards and sufficient supporting authority to support the expert's "bald assertion" that his methodology was generally accepted.[74]

Similarly here, the district court found that McMullen's opinion on how many specific work years Cramer would lose due to her injuries was not based on a reliable methodology. When the court questioned how McMullen came up with exactly 15 years, rather than 13 years or another similar number, McMullen could only generally explain that his opinion was based on his training, experience, and treatment of Cramer. McMullen was unable to explain his methodology, and Cramer failed to offer any factors, formula, or other supporting information to show how McMullen reached an opinion that Cramer's worklife expectancy would be diminished by exactly 15 years due to her injuries.

Based on our review of the record, we find that the district court did not abuse its discretion in excluding, on the basis that the opinion lacked sufficient foundation and reliable methodology, McMullen's opinion on a specific number of years of lost worklife expectancy.

---

[72] See *id*. See, also, *Schafersman v. Agland Coop, supra* note 68.

[73] *Kempf Contracting Design v. Holland-Tucker*, 892 N.E.2d 672 (Ind. App. 2008).

[74] *Id.* at 678.

## VI. CONCLUSION

For the foregoing reasons, UP's and Cramer's assignments of error have no merit. Accordingly, the judgment of the district court is affirmed.

Affirmed.

Cassel, J., concurring.

I write separately to encourage the trial judges and the bar to employ a belt-and-suspenders approach in crafting jury instructions, verdict forms, and procedures where both a plaintiff and a defendant have met their respective burdens of proof.

My district court experience taught me the following: Judges often do not trust juries to do math correctly, and a typical jury wants to see the exact effect of its verdict. In other words, juries do not trust judges either. Although the comparative fault regime in a Federal Employers' Liability Act[1] case differs from Nebraska's comparative fault statutes,[2] this aspect applies equally to both.

An extensive discussion appears in our jury instruction manual.[3] I do not intend to duplicate that recitation. But I respectfully disagree with the discussion there in one respect: There are *three*, not just two (judge does math or jury does it), possible ways of complying with the "statutory requirement."[4]

The third way is to combine both alternatives identified by the Nebraska Supreme Court Committee on Practice and Procedure. Before deliberations begin, tell the jury via detailed instructions how it is to perform the task, and in what order, and provide the jury with a verdict form that precisely follows the instructions' path and has appropriate blank spaces at each step. In that way, the verdict form would set forth the jury's underlying findings and the result of its mathematical

---

[1] See 45 U.S.C. § 51 et seq. (2018).

[2] See Neb. Rev. Stat. §§ 25-21,185.07 to 25-21,185.12 (Reissue 2016).

[3] See NJI2d Civ. 5.05, special note, comment & authorities.

[4] See *id.*, comment at 573.

computations. Then, at the time the verdict is returned and before accepting and entering judgment upon the verdict and discharging the jury, the trial judge should check the math, verify apparent compliance of the verdict with the instructions, and resolve—by further inquiry, instructions, or deliberations, or some combination—any uncertainties.

This approach would require careful crafting to the specific situation in each case. But the time and effort required pales in comparison to the costs and delays associated with an appeal or a new trial.

This, I suggest, conforms to both the statute[5] and our precedent.[6] I commend it to the committee's attention.

---

[5] See § 25-21,185.09.

[6] See, *City of Wahoo v. NIFCO Mech. Systems*, 306 Neb. 203, 944 N.W.2d 757 (2020); *Sinsel v. Olsen*, 279 Neb. 38, 777 N.W.2d 54 (2009); *Russell v. Stricker*, 262 Neb. 853, 635 N.W.2d 734 (2001); *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998).